SO ORDERED.

SIGNED this 15th day of July, 2016.



Dale L. Somers
United States Bankruptcy Judge

___

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

RAYMOND TODD PEMBLETON,
LISA DENIS PEMBLETON,

                DEBTORS.

CASE NO. 15-22609-13
CHAPTER 13

# OPINION OVERRULING CREDITOR
# AMERICREDIT FINANCIAL SERVICES' OBJECTION
# TO THE DEBTORS' VALUATION OF ITS COLLATERAL

This matter came before the Court for an evidentiary hearing on March 21, 2016. Creditor AmeriCredit Financial Services objected to the value the Chapter 13 Debtors stated in their plan for the vehicle securing its claim, and the Debtors objected to AmeriCredit's claim to the extent it asserted a higher value for the vehicle than they attributed to it. AmeriCredit appeared at trial by counsel Jill D. Olsen, and the Debtors

appeared by counsel Nancy Leah Skinner. The Court heard evidence and the parties' arguments, and took the matter under advisement.

**Facts**

The Debtors filed a Chapter 13 petition and supporting documents, including a Chapter 13 plan, on December 18, 2015. They reported owning a 2009 Chrysler Town & Country with about 120,000 miles on it, and said its current value was $4,939. They reported that GM Financial had a lien on the vehicle to secure a debt of $11,955. They proposed to pay the creditor $4,939 through their plan as a secured claim.

AmeriCredit Financial Services, d/b/a GM Financial, filed a proof of claim for $11,856.42 secured by the Debtors' Chrysler, which the creditor asserted was worth $8,700. The Debtors objected to the claim, alleging that the vehicle was worth $5,027, as shown by the Kelley Blue Book private party sale value. AmeriCredit responded that it had obtained an appraisal that valued the vehicle at $8,981.67, and also objected to the Debtors' plan, contending the plan violated § 1325(a)(4) and (5) of the Bankruptcy Code because it would not pay AmeriCredit that appraised value on its secured claim. The objection to confirmation was set for an evidentiary hearing that took place on March 21, 2016.

As indicated, the Debtors relied on the Kelley Blue Book private party sale value, offering as evidence a print-out from the online KBB dated January 14, 2016. AmeriCredit conceded the exhibit was an authentic copy of the KBB private party sale report, but argued the value it contained did not meet the applicable valuation standard.

AmeriCredit relied on a valuation done by Steve Vater, an auto damage appraiser who works for PDA of Kansas City. The PDA of the company's name stands for Property Damage Appraisers. Mr. Vater's job involves assessing damage on vehicles and trying to reach agreements with shops on the cost of making repairs. Mr. Vater sometimes also values vehicles as part of that process. Most of PDA's clients are insurance companies, but can include anyone that needs damage to a vehicle to be assessed. PDA is not in the business of selling vehicles.

Mr. Vater looked at the Debtors' minivan at their home. He inspected it inside and out, and took pictures of it that were presented at trial. He determined the minivan was in nice, average shape, although it had exterior body damage that would cost $2,181.79 to repair. He assumed insurance would pay to repair the damage. He did not turn the van on or drive it, did not open the hood, and did not test any of its mechanical systems.

To value vehicles, PDA relies on Internet searches of NADA publications and a web site called Autotrader.com. On Autotrader, dealers offer vehicles for sale, stating an asking price as part of each listing. Mr. Vater found three 2009 Chrysler Town & Country minivans on Autotrader that matched the specifications and mileage of the Debtors' van fairly closely. He did not record or remember the mileage of these minivans, but said he looks for vehicles whose mileage is within about 5,000 miles of the one he is valuing. He also did not record or remember how far away from him the vehicles were physically located, although he said he tries to find vehicles within 100 miles and searches farther away only if he can't find comparable ones that close. Mr.

3

Vater called the dealers who had the minivans he selected and obtained the prices they were asking for the ones they had. One dealer was asking $8,500, the second was asking $8,450, and the third was asking $9,995. Mr. Vater concluded the average of these prices, $8,981.67, was the approximate actual cash value of the Debtors' minivan. He said this was a standard valuation method in the insurance industry, but conceded neither he nor PDA was in the business of selling vehicles at retail. No evidence was presented to show whether the Debtors had insurance that would pay to repair the damage Mr. Vater found on their minivan, or if they did, whether they would have to pay a deductible before the insurance would pay for the rest. So far as Mr. Vater's report showed, the minivan was worth $6,799.88, the average asking price he found for similar vehicles minus the cost to repair the damage he itemized.

The Court found Mr. Vater to be credible, giving testimony that was honest, candid, and forthright. The Court is convinced he is an expert in evaluating vehicle damage and determining the cost of making repairs for insurance purposes. Insurance companies find him to be reliable at valuing vehicles to the extent necessary for the insurance company to decide whether a vehicle has been so damaged that the cost of repairs would exceed its value. However, neither he nor the company he works for is in the business of selling vehicles in the retail market, or otherwise determining the current retail value of a vehicle.

**Discussion**

For Chapter 13 debtors who want to retain a vehicle that is subject to a lien,

4

§ 1325(a)(5) of the Bankruptcy Code requires them, among other things, to propose a plan making payments to the lienholder that have a present value, as of the effective date of the plan, that is equal to the amount of the lienholder's allowed secured claim. As the parties agreed at the evidentiary hearing on valuation that AmeriCredit had the burden of proving the Debtors' proposed value for their minivan was too low, the Court did not need to determine which party in fact had the burden of proof on this issue.

For a lien that was not incurred within 910 days of filing bankruptcy to buy the vehicle, § 506(a)(1) provides that the lienholder's allowed claim is secured to the extent of the value of the vehicle and that generally, the value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." However, in 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act added subsection (2) to § 506(a).[1] This new provision reads:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

Chief Judge Nugent considered this new provision in a case in 2009, *In re Cook*.[2] He first concluded the time to value property acquired for personal, family, or household

---

[1] Pub. L. No. 109–8, § 327, 119 Stat 23, 99-100 (2005).

[2] 415 B.R. 529 (Bankr. D. Kan. 2009).

purposes (like the Debtors' minivan in this case) is governed by the second sentence, which requires determining the value as of the time value is determined rather than as of the time the case was filed.[3]  This Court agrees with Judge Nugent's reasoning on this point and will not look to the petition date in valuing the Debtors' vehicle here.

Next, Judge Nugent concluded the "replacement value" standard in the new provision codified the Supreme Court's decision in *Associates Commercial Corp. v. Rash*,[4] but modified it in some ways.[5]  *Rash* had indicated that replacement value should not include the value of items the debtor does not receive when he or she retains a vehicle, such as warranties, inventory storage, and reconditioning, but the first sentence of the new provision says that the replacement value of personal property it covers is not to be reduced by the costs of sale or marketing.[6]  Judge Nugent construed the first sentence to mean that reconditioning (a cost of preparing a vehicle for sale) could not be deducted, contrary to *Rash*'s suggestion that such costs would reduce a vehicle's replacement value. However, Judge Nugent concluded the "age and condition" language of the second sentence "suggests that the cost of reconditioning may be deducted from the merchant retail value of personal use property in order to account for depreciation and wear."[7]  The

---

[3]*Id*. at 532-34.

[4]520 U.S. 953 (1997).

[5]415 B.R. at 534.

[6]*Id*.

[7]*Id*.

Case 15-22609   Doc# 39   Filed 07/15/16   Page 6 of 10

Court agrees with Judge Nugent's reasoning on this point as well.

Testimony from two appraisers was offered in *Cook*, and Judge Nugent noted they both relied on the National Automobile Dealers Association's web site to give them retail and trade-in values for the vehicle in question.[8] He found the best starting point for valuing a vehicle under § 506(a)(2) using NADA guides will usually be the NADA's "Clean Retail" value, defined by the NADA to mean a vehicle that (1) has no mechanical defects, (2) easily passes necessary inspections, (3) has a high gloss finish and only minor surface scratching on the paint, body, and wheels, (4) has minimal soiling and wear on the interior, with all equipment in working order, (5) has a clean title history, and (6) needs only minimal reconditioning to be ready for resale.[9] He then analyzed the appraisers' competing NADA valuations and made adjustments based on the age and condition of the car for items needed to bring it up to the "Clean Retail" standard.[10]

In this case, the parties did not rely on the NADA to prove the value of the Debtors' minivan. The only evidence of value that the Debtors offered was a print-out from the on-line Kelley Blue Book dated January 14, 2016, showing the "Private Party Value" of a minivan like theirs in "Good Condition" with 120,000 miles on it. The print-out provides the following explanation for "Kelley Blue Book® Private Party Value": "This is the starting point for negotiation of a used-car sale between a private buyer and

---

[8]*Id*. at 535.

[9]*Id*.

[10]*Id*. at 535-36.

7

seller. This is an 'as is' value that does not include any warranties. The final price depends on the car's actual condition and local market factors."

In *In re De Anda-Ramirez*, the Tenth Circuit BAP held that Judge Berger's finding in a Chapter 13 case that the proper valuation method under § 506(a)(2) for a vehicle was the Kelley Blue Book private party value, and not the KBB retail value, was not clearly erroneous.[11] The creditor had relied on the assumption that "retail" in § 506(a)(2) meant the same thing as "retail" in the Kelley Blue Book, but the BAP rejected that assumption, quoting definitions from the KBB that showed (1) KBB used "suggested retail value" to mean a vehicle that was in "excellent condition" and (2) less than 5% of used vehicles for sale qualify as "excellent."[12] Because the creditor had presented no evidence to support its assertion that the KBB "retail" value constituted "the price a retail merchant would charge" that § 506(a)(2) required the court to determine, the BAP ruled it was not clearly erroneous for the bankruptcy court to accept the value the debtors stated in their plan based on the KBB private party sale value. The Court believes this authority indicates it could be appropriate to adopt the KBB private party sale value in this case unless AmeriCredit presented convincing evidence of a higher value for the Debtors' minivan. Much like the parties in *De Anda-Ramirez*, the parties in this case have essentially asked the Court to choose between the KBB private party sale value and Mr. Vater's asserted appraised value.

---

[11]359 B.R. 794, 796-98 (10th Cir. BAP 2007).

[12]*Id.* at 797.

Mr. Vater described the Debtors' vehicle as being in "good, average condition," a description the Debtors did not dispute, and this seems to correspond to the "Good Condition" rating on the Kelley Blue Book valuation. However, the Court cannot accept AmeriCredit's assertion that the average asking prices Mr. Vater found establish "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." For many kinds of merchandise, the price a retail merchant places on an item is the price all or nearly all buyers will wind up paying for it. However, it is common knowledge that used car dealers set their asking prices for vehicles higher than the price they expect to receive because they know that nearly all potential buyers who come to them will expect to negotiate for a lower price. The Court understands KBB and NADA values to be based on prices paid in actual sales of vehicles, as reported to those companies, and not the initial prices the sellers asked for them. Even if Mr. Vater properly qualified as an expert at determining the retail value of vehicles, the Court was not convinced that his approach to valuing the Debtors' minivan in this case arrived at "the price a retail merchant would charge for [the vehicle] considering the age and condition of the [vehicle]," as required by § 506(a)(2).

**Conclusion**

In this case, the Court finds that the KBB private party value of $5,027 for the Debtors' minivan was the best evidence presented of the vehicle's value for purposes of § 506(a)(2) and § 1325(a)(5). To be confirmable, the Debtors' Chapter 13 plan must

9

propose to make payments to AmeriCredit with a present value equal to that amount.

# # #